## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HALL & ASSOCIATES,<br><br>       *Plaintiff*,<br><br>   v.<br><br>UNITED STATES ENVIRONMENTAL<br>PROTECTION AGENCY,<br><br>       *Defendant.* | Civil Action No. 19-330 (RDM) |

### MEMORANDUM OPINION AND ORDER

This Freedom of Information Act ("FOIA") case concerns four FOIA requests in which Plaintiff, Hall & Associates ("Hall"), seeks records from Defendant, the Environmental Protection Agency ("EPA"), concerning the extent to which the EPA follows a 2013 Eighth Circuit decision, *Iowa League of Cities v. EPA*, 711 F.3d 844 (8th Cir. 2013), outside of the Eighth Circuit. Before the Court are the parties' cross motions for summary judgment. Dkt. 36; Dkt. 38. For the reasons set forth below, the Court will **GRANT** in part and **DENY** in part Plaintiff's motion for summary judgment, Dkt. 36, and will **GRANT** in part and **DENY** in part Defendant's cross-motion for summary judgment, Dkt. 38.

### I.  BACKGROUND

**A.     Factual Background**

The FOIA requests in this case concern the EPA's regulation of wastewater treatment facilities. Every day, households and business in the United States send billions of gallons of wastewater to local facilities for cleaning and treatment. *See Hall & Assocs. v. EPA*, No. 18-1749, 2021 WL 1226668, at *1 (D.D.C. Mar. 31, 2021). After arriving at a treatment facility,

wastewater is cleaned using two methods.  First, a primary treatment process removes large and small solids, like plastic or sediment.  *Id.*  Next, a secondary treatment process eliminates the microscopic or dissolved waste that remains.  *Id.*  At many treatment facilities, primary treatment capacity exceeds secondary treatment capacity, meaning that, during periods of excess precipitation, a facility's secondary treatment processes may become overwhelmed.  *Id.*  When that happens, the facility might employ a process called "blending," wherein excess water is diverted from the secondary treatment process into an auxiliary treatment facility, where the wastewater is treated and then merged back with water processed through the main treatment facility.  *Id.*  The blended water is then discharged into circulation for public use.  *Id.*

The Clean Water Act authorizes the EPA to regulate the discharge of water from treatment facilities.  *See Ctr. for Regul. Reasonableness v. EPA*, 849 F.3d 453, 454 (D.C. Cir. 2017); *see also* 33 U.S.C. § 1311.  Pursuant to that authority, the EPA has promulgated a regulation generally prohibiting "bypass"—that is, the "intentional diversion of waste streams from any portion of a treatment facility."  40 C.F.R. § 122.41(m).  A treatment facility may not engage in bypass unless, among other things, it can show that there is "no feasible alternative" to doing so.  *Id.*

In 2013, the Eighth Circuit considered a challenge to a series of letters the EPA had sent to Senator Charles Grassley setting forth its view that certain types of blending constitute a bypass and are therefore subject to a "no feasible alternatives" requirement, even if the blended discharge ultimately satisfies the water-quality requirements applicable to non-blended discharges.  *See Iowa League of Cities*, 711 F.3d at 854, 859–60.  The Eighth Circuit held that these letters amounted to a procedurally defective legislative rule and accordingly vacated the rule.  *Id.* at 876.  It further held that even apart from that procedural problem, the agency had

acted "in excess of statutory authority" to the extent that the rule "impose[d] secondary treatment regulations on flows within facilities," "rather than at the point of discharge into navigable waters." *Id.* at 877–78.

In the wake of the Eighth Circuit's decision, the EPA released a "Desk Statement" on November 19, 2013, announcing that, while *Iowa League of Cities* was "legally binding within the Eighth Circuit," outside of that circuit:

> EPA will continue to work with States and communities with the goal of finding solutions that protect public health and the environment while recognizing economic constraints and feasibility concerns, *consistent with the Agency's existing interpretation of the regulations*.

Dkt. 36-2 at 180 (Pl.'s Ex. 18) (emphasis added); *see also Hall & Assocs. v. EPA*, 956 F.3d 621, 623 (D.C. Cir. 2020) (recounting the pertinent history of the EPA's alleged decision not to abide by *Iowa League of Cities* outside the Eighth Circuit). Seeking information regarding the EPA's policy response to the *Iowa League of Cities* decision, Hall has submitted a series of FOIA requests to the agency, including the four requests at issue in this case.

1.    *The Four States Meeting Request*

Shortly after the *Iowa League of Cities* decision, officials from EPA Region VII (which encompasses Iowa, Kansas, Nebraska, and Missouri) asked EPA Headquarters to send personnel to the region's annual 4-State Government Affairs Meeting ("Four States Meeting") to explain to the gathering of local, state, and federal stakeholders how the EPA would apply the *Iowa League of Cities* decision moving forward. Dkt. 36-3 at 7 (Pl.'s SMF ¶ 44); Dkt. 36-2 at 145 (Pl.'s Ex. 9). In response, EPA Headquarters sent three officials—Kevin Weiss, Connie Bosma, and Steven Neugeboren—to the Four States Meeting, which was held in Lenexa, Kansas (near Kansas City) on November 13, 2013. Dkt. 36-3 at 7 (Pl.'s SMF ¶ 45); Dkt. 36-2 at 153, 154 (Pl.'s Ex. 11). At that meeting, the EPA Headquarters officials explained that it was "EPA HQ's

current contention that the [Eighth Circuit's] ruling will only be binding to the [Eighth Circuit]
States," but they also cautioned that "they don't have everything figured out yet" and "will be
reviewing permits on a case-by-case basis."  Dkt. 36-2 at 155 (Pl.'s Ex. 11); *see also* Dkt. 36-3 at
7–8 (Pl.'s SMF ¶¶ 45–46).

On May 31, 2018, Hall submitted a FOIA request to the EPA seeking (1) "[a]ll records
and correspondence concerning the November 2013 4-States Meeting transmitted between EPA
HQ and EPA Region 7" that were "created on or after January 1, 2013;" and (2) "[a]ll records at
EPA HQ addressing, in any way, EPA HQ personnel attendance at the meeting, including travel
authorization records" ("Four States Meeting Request").  Dkt. 1-3 at 27 (Compl. Ex. 4); *see*
Dkt. 36-3 at 17 (Pl.'s SMF ¶ 115).  In response, the EPA's eDiscovery Division executed a
search of the Microsoft Outlook email accounts of 19 custodians among the EPA Region 7 and
Headquarters staff.  *See* Dkt. 38-2 at 2 (Def.'s SOF ¶ 5); Dkt. 38-3 at 4–5 & n.5 (Revised Kloss
Decl. ¶ 11) (hereinafter "Kloss Decl.").  The search applied a January 1, 2013 to January 1, 2018
date range and employed the following search terms: (("4-States" AND "2013") OR
("Governmental Affairs Meeting" AND "2013")).  Dkt. 38-2 at 2–3 (Def.'s SOF ¶ 5); Dkt. 38-3
at 5 (Kloss Decl. ¶ 11).  This search yielded 3,782 potentially responsive records.  *Id.*  With
respect to the second part of Hall's request, the EPA conducted a non-email search for records,
including travel expense reports, relating to Kevin Weiss's, Connie Bosma's, and Steven
Neugeboren's travel to the Four States Meeting.  Dkt. 38-3 at 5 (Kloss Decl. ¶ 12).  After
reviewing these materials, the EPA released 18 records in full and 6 records in part, withholding
some information pursuant to FOIA Exemption 6.  Dkt. 36-3 at 17 (Pl.'s SMF ¶ 116); Dkt. 38-2
at 3 (Def.'s SMF ¶ 7).  On December 19, 2018, Hall filed an administrative appeal challenging
the adequacy of the search, Dkt. 36-3 at 17 (Pl.'s SMF ¶ 118).

Due to a lapse in appropriations that forced the EPA to close for normal business in early 2019, the EPA was unable to respond to Hall's appeal before the commencement of this suit. Dkt. 38-2 at 4 (Def.'s SOF ¶ 9); Dkt. 38-3 at 6 (Kloss Decl. ¶ 15).  After the litigation began, the EPA conducted a supplemental search for records, applying a string search using the terms ("4-State*" OR "four state*" OR "Government* Affair* Meeting" OR "GA Meeting") AND ("Kansas City" OR "2013") to the original search date range and custodians.  Dkt. 38-2 at 4 (Def.'s SOF ¶ 10); Dkt. 38-3 at 6 (Kloss Decl. ¶ 16).  This search yielded 160,000 potentially responsive records, which the EPA was able to reduce to 20,000 after Hall agreed to limit the time frame of the search to the 2013 calendar year.  Dkt. 38-2 at 4 (Def.'s SOF ¶ 11); Dkt. 38-3 at 6 (Kloss Decl. ¶ 17).  To this batch, the EPA applied the following search string: ("4-State*" OR "four state*" OR "Government* Affair* Meeting" OR "GA Meeting").  Dkt. 38-2 at 4 (Def.'s SOF ¶ 11); Dkt. 38-3 at 7 (Kloss Decl. ¶ 17).  After removing duplicates and non-inclusive emails, 150 potentially responsive records remained.  Dkt. 38-2 at 4 (Def.'s SOF ¶ 11); Dkt. 38-3 at 7 (Kloss Decl. ¶ 17).  From these, the EPA located four additional responsive records, which it released in full to Hall on May 26, 2020.  Dkt. 38-2 at 4 (Def.'s SOF ¶ 11); Dkt. 38-3 at 7 (Kloss Decl. ¶ 17).

As part of its supplemental search, the EPA also completed a manual search of the travel system the EPA used in 2013, "GovTrip," for records relating to Kevin Weiss's, Connie Bosma's, and Steven Neugeboren's travel to the Four States Meeting.  Dkt. 38-3 at 7 (Kloss Decl. ¶ 18).  This search located 9 pages of responsive travel records, which the EPA produced to Hall on April 10, 2020.  *Id.*

2.    *The November 20, 2013 Email Request*

On October 25, 2013, Hall submitted a FOIA request to the EPA seeking records addressing the impact of the *Iowa League of Cities* decision on permitting and enforcement.

Dkt. 36-3 at 12 (Pl.'s SMF ¶ 83); Dkt. 1-3 at 30 (Compl. Ex. 5); *id.* at 33 (Compl. Ex. 6) (describing Hall's modifications to the request).  In response to that request, the EPA released, among other records, a partially redacted email dated November 20, 2013.  Dkt. 36-3 at 12 (Pl's SMF ¶ 84); Dkt. 38-2 at 14 (Def.'s SOF ¶ 39).  The EPA withheld the redacted portions of the email under the deliberative-process privilege of FOIA Exemption 5.  Dkt. 36-3 at 12 (Pl.'s SMF ¶ 84).

On August 7, 2018, Hall submitted a new request to the EPA seeking an unredacted copy of the November 20, 2013 email ("November 20, 2013 Email Request").  *Id.* at 13 (Pl's SMF ¶ 87); Dkt. 1-3 at 4 (Compl. Ex. 1).  On September 20, 2018, the EPA denied Hall's request in full, explaining that the withheld material was protected from disclosure under the deliberative-process, attorney-client, and attorney work-product privileges.  Dkt. 36-3 at 13 (Pl.'s SMF ¶ 89); Dkt. 1-3 at 39 (Compl. Ex. 7).  Hall filed an administrative appeal of EPA's decision, Dkt. 36-3 at 13 (Pl.'s SMF ¶ 91), and on November 30, 2018, the EPA's Assistant General Counsel upheld the redactions on the basis of the attorney work-product privilege alone, explaining that the "withheld portion of the November 20, 2013 email was prepared by an EPA attorney in anticipation of litigation related to [an] ongoing Clean Water Act enforcement action against the Passaic Valley Sewerage Commission" and "contains no reasonably segregable information that may be released."  Dkt. 1-3 at 46 (Compl. Ex. 9).

3.     *The Peak Flows Management Rulemaking Request*

In April 2018, the EPA announced that it was looking at issues associated with the management and treatment of peak flows during wet weather events at publicly owned treatment works ("POTWs") with separate sanitary sewer systems.  Dkt. 38-3 at 8 (Kloss Decl. ¶ 20). After this announcement, the EPA began to consider changes to its National Pollutant Discharge Elimination System ("NPDES") regulations and sought stakeholder input into the development

of a flexible rule that would enable a consistent approach to permitting while still protecting

human health and the environment.  *Id.*

On August 28, 2018, Hall submitted a FOIA request to the EPA that sought the

following:

1. Any documents prepared as part of the process for getting authorization to proceed with this proposed regulatory action [the "Peak Flows Management Rulemaking"], including any agency or inter-agency authorizations to proceed with the regulatory clarification activities announced by EPA on this topic.

2. Any documents, including any notices to OMB, or related background documents that describe the basis and background for why the Agency decided to undertake this regulatory action.

3. Any documents that describe the form or nature of the action being considered (*i.e.*, is this a possible regulatory or deregulatory action).

4. Any documents prepared as part of or in conjunction with this agency action that identifies or discusses the rule being considered or modification/ clarification to allow blending to occur.

Dkt. 1-3 at 9–10 (Compl. Ex. 2); Dkt. 38-3 at 8 (Kloss Decl. ¶ 21).  The request authorized

payment of up to $250.00 in processing fees.  Dkt. 1-3 at 9–10 (Compl. Ex. 2); Dkt. 38-3 at 8

(Kloss Decl. ¶ 21).

The EPA conducted an initial search that identified approximately 22,091 potentially

responsive records.  Dkt. 38-3 at 9 (Kloss Decl. ¶ 23).  Before reviewing those records, the EPA

notified Hall that the review would require $1,608.00 in processing fees, after which Hall

narrowed the request to drop the fourth category of documents.  *Id.* at 9–10 (Kloss Decl. ¶¶ 24–

25).  The EPA also notified Hall that "the requested payment would be below [Hall's] threshold

if [Hall] limited the scope of the request to not include the email correspondence under item 1."

*Id.* at 10 (Kloss Decl. ¶ 26).  In response, Hall informed the EPA:

We would like all other responsive documents to the request, other than that email correspondence, to be processed immediately and released.

We will determine whether and how we would like to proceed with the responsive email correspondence and issue a payment assurance at that time.

*Id.* at 147 (Kloss Decl. Ex. 9); *see id.* at 10 (Kloss Decl. ¶ 26).

On October 19, 2018, the EPA provided an interim response to Hall's narrowed request, producing five partially redacted power point presentations entitled *Bypass and Blending: Wet Weather Impacts at Treatment Plants*, Dkt. 36-3 at 14 (Pl.'s SMF ¶ 95); *see also* Dkt. 38-3 at 11 (Kloss Decl. ¶ 29), and listing an additional nine responsive documents that were being withheld in full, Dkt. 36-3 at 14 (Pl.'s SMF ¶ 97); *see also* Dkt. 38-3 at 11 (Kloss Decl. ¶ 29). The agency explained that all redactions and withholdings were made pursuant to the deliberative-process privilege of FOIA Exemption 5. Dkt. 36-3 at 14 (Pl.'s SMF ¶¶ 96–97); *see also* Dkt. 38-3 at 11 (Kloss Decl. ¶ 29).

On November 1, 2018, Hall filed an administrative appeal challenging the agency's withholdings, the adequacy of the search, and the fees associated with obtaining responsive records. Dkt. 36-3 at 14–15 (Pl.'s SMF ¶ 98); Dkt. 38-3 at 11 (Kloss Decl. ¶ 31). The EPA's Office of General Counsel granted the appeal in part and denied it in part. Dkt. 38-3 at 12 (Kloss Decl. ¶ 32). It granted Hall's appeal of the adequacy of the search and directed the EPA to conduct an additional search for responsive records. *Id.* On remand, the EPA conducted two supplemental searches; the first yielded six additional documents that were withheld in full under Exemption 5's deliberative-process and attorney-client privileges, and the second yielded an additional eight responsive records, six of which were withheld in full under the deliberative-process and attorney-client privileges, and two of which were released in full. *Id.* (Kloss Decl. ¶¶ 33–34).

4.     *The Enforcement Orders Request*

The Water Enforcement Division of EPA's Office of Enforcement and Compliance

Assurance is responsible for civil enforcement of the Clean Water Act.  Dkt. 40-1 at 1–2

(Revised Pollins Decl. ¶¶ 1–2) (hereinafter "Pollins Decl.").  Under Section 309 of the Clean

Water Act, the EPA may enforce violations of NPDES permits through an administrative order

or a civil or criminal action.  *See* 33 U.S.C. § 1319(a)(3), (b), (c).

On June 14, 2018, Hall submitted a FOIA request to the EPA seeking "any and all

records at EPA HQ concerning:"

1.  Any type of enforcement order or action where EPA was a party, within the
    past 3 years, that would or did classify blending as a bypass;

2.  Any type of enforcement order or action where EPA was a party, within the
    past 3 years, that indicated blending may be implemented as an interim
    measure; and

3.  Any and all documents, located at EPA Headquarters and EPA Region 2,
    associated with the attached Passaic Valley Sewerage Commission
    ["PVSC"] Administrative Order, including any draft versions of the attached
    Order.

Dkt. 1-3 at 12–13 (Compl. Ex. 3); *see* Dkt. 36-3 at 15 (Pl.'s SMF ¶ 101).

Over the next few months, the parties discussed several clarifications to the request.  Dkt.

36-3 at 15 (Pl.'s SMF ¶ 103); *see* Dkt. 1-3 at 57–71 (Compl. Ex. 12).  On July 3, 2018, the

parties held a call, which the EPA memorialized in an email shortly thereafter.  Dkt. 1-3 at 66–67

(Compl. Ex. 12).  During that call, Hall agreed to limit parts one and two to "any document

(letter, notice, etc.) that would have the effect of an enforcement order" and to limit part three to

any records "discussing" the attached administrative order, rather than records "associated with"

the order.  *Id.* at 67 (Compl. Ex. 12).

With the request so clarified, the EPA conducted a search for responsive records.  Dkt.

40-1 at 4 (Pollins Decl. ¶ 9).  Since records responsive to parts one and two are publicly

available, the EPA identified three publicly available databases and sources that would include documents that "have the effect of an enforcement order": (1) EPA's Enforcement and Compliance History Online database, (2) EPA's enforcement website, and (3) EPA's Administrative Docket website. *Id.* at 4–5 (Pollins Decl. ¶ 9). As a courtesy, the EPA searched these publicly available databases using a June 14, 2015 to June 14, 2018 date range. *Id.* at 5 (Pollins Decl. ¶ 10). The databases were then filtered to capture any Clean Water Act actions containing references to "blending" or "bypass." *Id.* The EPA also manually reviewed the Civil Cases and Settlements section of the EPA Enforcement Website for Clean Water Act actions that contained responsive information. *Id.* On August 15, 2018, the EPA notified Hall that it "found no responsive documents for items #1 and #2 of the request." Dkt. 1-3 at 60 (Compl. Ex. 12); Dkt. 36-3 at 15 (Pl.'s SMF ¶ 104); *see also* Dkt. 40-1 at 5 (Pollins Decl. ¶ 10).

To locate records responsive to part three, the EPA searched the Microsoft Outlook email accounts of ten custodians from the Water Enforcement Division, the Water Law Office of the Office of General Counsel, and Region 2's Office of Regional Counsel, who were identified as the individuals likely to possess responsive records. Dkt. 40-1 at 6 (Pollins Decl. ¶ 11). The search applied a June 14, 2015 to June 14, 2018 date range and the key words "PVSC" OR "Passaic Valley Sewerage Commission" OR "Passaic Valley Sewer Commission." *Id.* at 6. These parameters identified 4,349 records, of which 1,866 were deemed responsive. *Id.* at 6 (Pollins Decl. ¶¶ 11, 13).

The EPA produced the first batch of responsive documents with respect to this request on August 9, 2018. Dkt. 1-3 at 61–62 (Compl. Ex. 12). On August 29, 2018—after the EPA had run its search and while the review was ongoing—Hall sent a clarification letter to the EPA, which asked the EPA to "only provide copies of PVSC-related records that discuss how or

whether blending would be regulated as a bypass;" to "[r]eleas[e] copies of any enforcement action that would regulate blending as a bypass;" and to "[l]imit the review of the PVSC-related documents to only those discussing the blending issue." *Id.* at 75 (Compl. Ex. 13); *see id.* at 65 (Compl. Ex. 12) (explaining, on July 23, 2018, that the EPA had "reviewed nearly 3,000 documents" and had "nearly 1,500 documents to go"). The EPA completed its review on September 20, 2018 and released 401 records to Hall and withheld 1,480 records in full pursuant to the deliberative-process, attorney-client, and attorney work-product privileges recognized under FOIA Exemption 5. Dkt. 40-1 at 6 (Pollins Decl. ¶ 13).

On December 18, 2018, Hall filed an administrative appeal challenging, among other things, the agency's withholdings and the adequacy of its search. Dkt. 36-3 at 16 (Pl.'s SMF ¶ 108); *see also* Dkt. 1-3 at 80 (Compl. Ex. 15). Hall commenced this action before the agency responded to that appeal. Dkt. 40-1 at 7 (Pollins Decl. ¶ 14). Shortly thereafter, however, the EPA re-reviewed the records at issue and determined that approximately 320 records of the fully withheld documents were not responsive to the request and approximately 700 records were duplicates. *Id.* at 7 (Pollins Decl. ¶ 15). Upon re-review, the EPA released an additional 72 records in full and 223 records in part and withheld 153 records in full. *Id.*

## B.    Procedural History

Hall commenced this action on February 8, 2019, Dkt. 1 (Compl.), and the EPA answered on May 2, 2019, Dkt. 9. On May 14, 2019, Hall moved to deem certain allegations in the complaint admitted by the EPA, Dkt. 10, which the EPA opposed, Dkt. 14. On February 13, 2020, the Court granted in part and denied in part Hall's motion, concluding that the EPA had "fail[ed] to admit or deny certain factual allegations requiring a response" and deeming

paragraphs 31, 32, 43, 47, and 49 of the complaint "admitted in full" and paragraphs 14, 17, 29, 44, and 54 "admitted in part."  Min. Order (Feb. 13, 2020).

Between March and October 2020, the parties submitted a series of status reports to the Court while the EPA continued to respond to Hall's FOIA requests.  Dkt. 20; Dkt. 22; Dkt. 23; Dkt. 24; Dkt. 26.  On October 15, 2020, the EPA indicated that it had responded to each of the FOIA requests in full, and the parties represented that they had reached an impasse with respect to several issues in the litigation.  Dkt. 26 at 1–3.  As a result, the Court ordered the EPA to provide Hall with a draft declaration and a *Vaughn* index, Min. Order (Oct. 16, 2020), and held a pre-motion conference with the parties on January 15, 2021, *see* Min. Entry (Jan. 15, 2021); Dkt. 35.  Hall moved for summary judgment on February 24, 2021, Dkt. 36, and the EPA cross-moved on May 18, 2021, Dkt. 38.  Those motions were fully briefed by October 11, 2021, *see* Dkt. 47; however, on October 18, 2021, Hall moved for leave to file a surreply, Dkt. 48, which the EPA opposed, Dkt. 49.[1]

---

[1] Upon consideration of Hall's motion for leave to file a surreply, Dkt. 48, the EPA's opposition thereto, Dkt. 49, and Hall's reply, Dkt. 50, the Court will **DENY** the motion.  The decision to grant leave to file a surreply is a discretionary one.  *Plunkett v. Dep't of Justice*, 249 F. Supp. 3d 73, 75 n.2 (D.D.C. 2017).  In making this decision, "the Court considers whether the surreply is helpful to the adjudication of the motion for summary judgment and whether [the nonmoving party] will be unduly prejudiced if the [C]ourt grants leave to allow the surreply."  *Id.*  Hall advances two sets of arguments in support of its proposed surreply.  First, it contends that, because Hall—and not the EPA—moved first for summary judgment, it is entitled to the last word, since the defendant typically moves first for summary judgment in a FOIA case.  This argument fails, however, because neither FOIA nor the Federal Rules dictate a particular order in which the parties must move for summary judgment, and, in any event, "[t]he 'prejudice' that comes from not having the 'last word' is not the kind of prejudice relevant when considering whether to grant leave to file a surreply."  *Shea v. Clinton*, No. 02-0577, 2012 WL 13075787, at *3 (D.D.C. Dec. 7, 2012).  Second, Hall maintains that a surreply is necessary to address two issues raised for the first time in the EPA's reply.  This argument is also unavailing.  Both issues Hall identifies were raised at earlier stages in the briefing, and, thus, a surreply would not be helpful to the adjudication of the issues.

While the foregoing motions were pending, on January 20, 2022, Hall filed a notice of supplemental authority and motion for a show cause order, in which it argued that a recent order of the Eighth Circuit, *Iowa League of Cities v. EPA*, No. 11-3412, 2021 WL 6102534 (8th Cir. Dec. 22, 2021), "verifies" several contentions Hall has made in this litigation and also provides "*prima facie* confirmation that EPA has been malfeasant in its actions" in this litigation.  Dkt. 52 at 1–3.  This malfeasance, in Hall's view, at least raises the question whether the EPA should be required to release *all* the records it has withheld.  *Id.* at 2.  Because the thrust of Hall's filing was that the Eighth Circuit's decision "impacts several of its arguments in support of summary judgment in the present FOIA action," the Court construed Hall's motion as "a motion for supplemental briefing on summary judgment" and set a schedule for supplemental briefing, Min. Order (Jan. 21, 2022), which concluded on March 10, 2022, *see* Dkt. 56; Dkt. 57.[2]  The parties' cross-motions are now ripe for decision.

## II.  LEGAL STANDARD

### A.    The Freedom of Information Act

Congress enacted FOIA "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny."  *Bartko v. Dep't of Just.*, 898 F.3d 51, 61 (D.C. Cir. 2018) (internal quotation marks omitted).  The Act is premised on the notion that "an informed citizenry [is] vital to the functioning of a democratic society . . . [and] needed to check against corruption and to hold the governors accountable to the governed."  *NLRB v. Robbins Tire &*

---

[2] The Court has reviewed the parties' supplemental submissions and the Eighth Circuit's decision in *Iowa League of Cities v. EPA*, No. 11-3412, 2021 WL 6102534 (8th Cir. Dec. 22, 2021), and concludes that the Eighth Circuit's order is sufficiently disconnected from the matters in this litigation such that it does not materially affect any of the issues before the Court.  As a result, the Court will proceed to consider the arguments the parties submitted in their original summary judgment briefing in this matter.

*Rubber Co.*, 437 U.S. 214, 242 (1978).  FOIA thus "protects the basic right of the public to be informed about what their government is up to," *Hall*, 956 F.3d at 624 (internal quotation marks omitted), and embraces "a general philosophy of full agency disclosure," *U.S. Dep't of Def. v. FLRA*, 510 U.S. 487, 494 (1994) (internal quotation marks omitted).

"FOIA does not pursue transparency at all costs," however.  *Hall*, 956 F.3d at 624. Instead, Congress recognized that "legitimate governmental and private interests could be harmed by release of certain types of information."  *AquAlliance v. U.S. Bureau of Reclamation*, 856 F.3d 101, 102 (D.C. Cir. 2017) (quoting *Dep't of Just. v. Julian*, 486 U.S. 1, 8 (1988)).  As a result, it exempted nine categories of records from FOIA's disclosure requirements.  *See* 5 U.S.C. § 552(b)(1)–(9).  In general, these exemptions are to be "narrowly construed."  *FBI v. Abramson*, 456 U.S. 615, 630 (1982).

When an agency withholds records based on a FOIA exemption, it bears the burden of justifying its withholding.  *See Fed. Open Mkt. Comm. of the Fed. Rsrv. Sys. v. Merrill*, 443 U.S. 340, 352 (1979); *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008).  That requires the government to submit either "relatively detailed and non-conclusory" affidavits or declarations explaining why a document was withheld, *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quoting *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981)), or an index that further elucidates, on a document-by-document basis, the rationale for the FOIA exemptions claimed (a "*Vaughn* index"), *see Vaughn v. Rosen*, 484 F.2d 820, 827–28 (D.C. Cir. 1973).  "The description and explanation the agency offers should reveal as much detail as possible as to the nature of the document, without actually disclosing information that deserves protection."  *Oglesby v. U.S. Dep't of the Army*, 79 F.3d 1172, 1176 (D.C. Cir. 1996). In addition, "[t]o withhold a responsive record, an agency must show both that the record falls

within a FOIA exemption," and, in most cases, "that the agency 'reasonably foresees that disclosure would harm an interest protected by [the] exemption.'"  *Machado Amadis v. U.S. Dep't of State*, 971 F.3d 364, 370 (D.C. Cir. 2020) (quoting 5 U.S.C. § 552(a)(8)(A)(i)(I)). Finally, because "the focus of . . . FOIA is information, not documents, . . . an agency cannot justify withholding an entire document simply by showing that it contains some exempt material."  *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977).  Rather, FOIA requires the agency to release "[a]ny reasonably segregable portion of a record . . . after deletion of the portions which are exempt."  5 U.S.C. § 552(b).  "Before approving the application of a FOIA exemption, the district court must make specific findings of segregability regarding the documents to be withheld."  *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007); *see also Stolt-Nielsen Transp. Grp. v. United States*, 534 F.3d 728, 734 (D.C. Cir. 2008) ("[A]n agency cannot justify withholding an entire document simply by showing that it contains some exempt material." (internal quotation marks and citation omitted)).

## B.      FOIA Exemption 5

Exemption 5 permits the withholding of "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  Courts have construed this exemption to encompass "the privileges available to Government agencies in civil litigation."  *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 783 (2021); *see also Tax'n With Representation Fund v. IRS*, 646 F.2d 666, 676 (D.C. Cir. 1981).  This category includes "materials which would be protected under the attorney-client privilege, the attorney work-product privilege, or the executive deliberative process privilege."  *Tax'n With Representation Fund*, 646 F.2d at 676 (internal

15

quotation marks and citations omitted).  In this case, the EPA relies on the deliberative process, attorney-client, and attorney work-product privileges to justify its invocations of Exemption 5.

    1.   *Deliberative Process Privilege*

The deliberative process privilege protects "documents reflecting advisory opinions, recommendations[,] and deliberations comprising part of a process by which governmental decisions and policies are formulated." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975) (internal quotation marks omitted).  The "privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions, by protecting open and frank discussion among those who make them within the Government." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001) (internal quotation marks and citations omitted).  "Manifestly, the ultimate purpose of this long-recognized privilege is to prevent injury to the quality of agency decisions." *Sears*, 421 U.S. at 151.

To invoke the privilege, an agency must demonstrate that the withheld record is both predecisional and deliberative. *See U.S. Fish & Wildlife Serv.*, 141 S. Ct. at 785–86.  In practice, these requirements "tend to merge." *Access Rep. v. Dep't of Just.*, 926 F.2d 1192, 1195 (D.C. Cir. 1991).  A record is predecisional if it was "generated before the adoption of agency policy," *Coastal States Gas Corp.*, 617 F.2d at 866 (emphasis omitted), and "if it was prepared in order to assist an agency decisionmaker in arriving at his decision, rather than to support a decision already made," *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (internal quotation marks and citations omitted).  A record is deliberative, meanwhile, if it "reflects the give-and-take of the consultative process." *Coastal States Gas Corp.*, 617 F.2d at 866; *see also Tax Analysts v. IRS*, 117 F.3d 607, 616 (D.C. Cir. 1997); *Jud. Watch, Inc., v. Dep't*

16

*of Energy*, 412 F.3d 125, 129 (D.C. Cir. 2005).  When invoking the privilege, therefore, an

"agency must establish what deliberative process is involved, and the role played by the

documents in issue in the course of that process."  *Senate of the Commonwealth of Puerto Rico*

*on Behalf of Judiciary Comm. v. U.S. Dep't of Just.*, 823 F.2d 574, 585–86 (D.C. Cir. 1987)

(internal quotation marks and citation omitted).  The agency must also explain "the nature of the

decisionmaking authority vested in the office or person issuing the disputed document(s), and the

positions in the chain of command of the parties to the documents."  *Arthur Andersen & Co. v.*

*IRS*, 679 F.2d 254, 258 (D.C. Cir. 1982) (internal quotation marks and citation omitted).  Finally,

the foreseeable-harm requirement applies with special force to deliberative process withholdings

under Exemption 5, which Congress viewed as posing particular risks of "overuse."  *Ctr. for*

*Investigative Reporting v. U.S. Customs and Border Prot.*, 436 F. Supp. 3d 90, 105 (D.D.C.

2019) (quoting H.R. Rep. No. 114-391, at 10 (2016)).

      In some circumstances, the deliberative process privilege will not apply outright.  That

may occur when the contents of the document were "adopted, formally or informally, as the

agency position on an issue or [are] used by the agency in its dealings with the public."  *Coastal*

*States Gas Corp.*, 617 F.2d at 866.  So too documents that reflect an agency's "working law"—

that is, "opinions and interpretations which embody the agency's effective law and policy"—

remain unshielded by Exemption 5.  *Sears*, 421 U.S. at 153 (internal quotation marks omitted);

*see also Tax'n With Representation Fund*, 646 F.2d at 677 (explaining that Exemption 5 does not

"protect communications that implement an established policy of an agency").  As the D.C.

Circuit has explained, an agency may not develop a "a body of 'secret law,' used by it in the

discharge of its regulatory duties and in its dealings with the public, but hidden behind a veil of

privilege because it is not designated as 'formal,' 'binding,' or 'final.'"  *Schlefer v. United States*,

702 F.2d 233, 244 (D.C. Cir. 1983) (quoting *Coastal States Gas Corp.*, 617 F.2d at 867).

Finally, Exemption 5 does not, of course, protect "final agency actions that constitute statements

of policy or final opinions that have the force of law, or which explain actions that an agency has

already taken." *Tax'n With Representation Fund*, 646 F.2d at 677.

In sum, then, the deliberative process privilege "protects 'predecisional communications'

reflecting an agency's internal deliberations, but not communications that explain a decision that

has already been made." *Tax Analysts v. IRS*, 294 F.3d 71, 80 (D.C. Cir. 2002) (quoting *Sears*,

421 U.S. at 151–52).

2.    *Attorney-Client Privilege*

Exemption 5 also incorporates the attorney-client privilege, which protects "confidential

communications between an attorney and his client relating to a legal matter for which the client

has sought professional advice." *Mead Data*, 566 F.2d at 252.  In FOIA cases, the agency is

typically the "client" and the agency's lawyers (or lawyers at the Department of Justice) are

typically the "attorneys" for the purposes of the attorney-client privilege.  *See In re Lindsey*, 148

F.3d 1100, 1105 (D.C. Cir. 1998) (citing *Coastal States Gas Corp.*, 617 F.2d at 863).  "The

attorney-client privilege protects confidential communications from clients to their attorneys

made for the purpose of securing legal advice" and "communications from attorneys to their

clients if the communications 'rest on confidential information obtained from the client.'" *Tax

Analysts*, 117 F.3d at 618 (quoting *In re Sealed Case*, 737 F.2d 94, 98–99 (D.C. Cir. 1984)).

3.    *Attorney Work-Product Privilege*

Exemption 5 further incorporates the attorney work-product privilege, which protects

"documents and other memoranda prepared by an attorney in anticipation of litigation." *House

v. U.S. Dep't of Just.*, 197 F. Supp. 3d 192, 207 (D.D.C. 2016); *see FTC v. Boehringer Ingelheim

Pharm., Inc.*, 778 F.3d 142, 149 (D.C. Cir. 2015); *Hickman v. Taylor*, 329 U.S. 495, 510–11

(1947).  Because the work-product doctrine "does not distinguish between factual and deliberative material[,] . . . any part of a document prepared in anticipation of litigation, not just the portions concerning opinions, legal theories, and the like, is protected by the work product doctrine and falls under [E]xemption 5." *Jud. Watch, Inc. v. Dep't of Just.*, 432 F.3d 366, 371 (D.C. Cir. 2005) (cleaned up).  In other words, factual material is privileged when it appears within documents that are "fully protected as work product," and, thus, "segregability is not required" with respect to those documents.  *Id.*

## C.    Summary Judgment

FOIA cases are typically resolved on motions for summary judgment under Federal Rule of Civil Procedure 56.  *See, e.g.*, *Beltranena v. U.S. Dep't of State*, 821 F. Supp. 2d 167, 175 (D.D.C. 2011).  To prevail on a summary judgment motion, the moving party must demonstrate that there are no genuine issues of material fact and that she is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  A fact is "material" if it is capable of affecting the outcome of a dispute, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and a dispute is "genuine" if the evidence is such that a reasonable factfinder—here, the Court—could find in favor of the nonmoving party, *see Scott v. Harris*, 550 U.S. 372, 380 (2007).  For a FOIA case in particular, summary judgment may be granted on the basis of agency affidavits if they "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Elec. Frontier Found. v. U.S. Dep't of Just.*, 739 F.3d 1, 7 (D.C. Cir. 2014) (quoting *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984)).

The Court reviews an agency's decision to withhold records or portions thereof *de novo*. *See* 5 U.S.C. § 552(a)(4)(B).

### III.  ANALYSIS

Hall's complaint lodges various challenges to the EPA's four FOIA responses.  The parties have cross-moved for summary judgment with respect each response, which the Court will now address in turn.

### A.      The Four States Meeting Request

Hall's first challenge is to the adequacy of the EPA's search for records responsive to the Four States Meeting Request.  "In order to obtain summary judgment" with respect to an adequacy-of-the-search challenge, the agency must show "that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested."  *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).  The critical question for the Court, then, is whether the agency's methods were "reasonably calculated to discover the requested documents, not whether [they] actually uncovered every document extant."  *SafeCard Servs., Inc.*, 926 F.2d at 1201.

The EPA's search for records responsive to the Four States Meeting Request satisfies this standard.  Although Hall's motion raises a number of perceived deficiencies with the EPA's search, Hall does not muster a serious challenge to the methodology that the EPA employed with respect to either part of the Four States Meeting Request.

With respect to part two of the request, the undisputed facts demonstrate that the EPA conducted a reasonable search calculated to uncover "[a]ll records at EPA HQ addressing, in any way, EPA HQ personnel attendance at the meeting, including travel authorization records."  Dkt. 1-3 at 27 (Compl. Ex. 4).  As the Kloss declaration explains, the EPA manually searched the records of the three EPA Headquarters attendees of the Four States Meeting and searched for travel records in the travel system the agency used in 2013, GovTrip.  Dkt. 38-3 at 5, 7 (Kloss

20

Decl. ¶¶ 12, 18).  This search yielded nine pages of responsive travel records, which the EPA released to Hall.  *Id.* at 7 (Kloss Decl. ¶ 18).

Hall maintains that this search was "[c]learly [d]eficient" because there are "two categories of records that would be responsive to the request" and "plainly exist" but that the search did not yield: (1) "travel authorization records" for the EPA Headquarters staff who attended the Four States Meeting, and (2) "any records that state the purpose of attending the meeting or what would be said at the meeting (*e.g.*, talking points or briefing sheets prepared in advance)."  Dkt. 36-1 at 21–22.  This argument is unpersuasive.

As an initial matter, the agency's failure to locate certain documents is not dispositive, because "[t]he adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search."  *Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003).  Hall speculates that "travel authorization records" for the relevant individuals must exist, but it does not propose any different methodology that it believes the agency should have pursued to uncover them.  The EPA's search methodology, moreover, did locate and release "email records and travel expense reports for the three headquarter employees . . . who attended the 4-States meeting," Dkt. 38-3 at 6 (Kloss Decl. ¶ 13), and a subsequent "manual search of the [EPA's] former travel system" "located . . . travel details and signature histories, similar to an audit trail," *id.* at 7 (Kloss Decl. ¶ 18).

Hall's argument with respect to the second category of documents also fails because it rests on an unreasonable interpretation of its own FOIA request.  Part two of the Four States Meeting Request sought "[a]ll records at EPA HQ addressing, in any way, EPA HQ personnel attendance at the meeting, including travel authorization records."  Dkt. 1-3 at 27 (Compl. Ex. 4).

Hall seizes on the request's use of the words "in any way" to argue that "briefing materials" clearly fall in scope of the request because they are related "in any way" to "personnel attendance." Dkt. 42 at 16-17. The Court is unpersuaded. Standing alone, the phrase "records . . . addressing . . . personnel attendance" is most reasonably understood to denote travel records, receipts, and forms—not talking points or substantive memoranda—even when the qualifier "in any way" is added. Any doubt on that score, however, is removed by Hall's inclusion of the example "travel authorization records" in the following clause. Although Hall is correct that an agency must "construe a FOIA request liberally," *Nation Mag. v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995), the agency is only under an obligation to "read FOIA requests as drafted," *Machado Amadis*, 971 F.3d at 370, and the text of the request as written does not encompass talking points or briefing materials. Hall could have drafted the text of its request to bring these records in scope, but it failed to do so.

Hall's challenge to the agency's search for records responsive to part one fails for similar reasons. As with the EPA's response to part two, the undisputed record before the Court establishes that the agency's search methodology with respect to part one was reasonably calculated to uncover responsive records, and none of Hall's arguments to the contrary is persuasive. First, Hall attacks the EPA's search terms—(("4-State*" OR "four state" OR "Government* Affair* Meeting" OR "GA Meeting") AND ("Kansas City" OR "2013"))— because it is conceivable that "there are responsive records[] that would . . . discuss[] the content of EPA's intended announcement at the 4-States Meeting[] that may not contain the key words 'Kansas City' or '2013' and therefore, would not be identified through that search." Dkt. 36-1 at 22. Hall's contention that the EPA's decision to limit its search results to records that included either the term "Kansas City" or "2013" was too restrictive fails for a simple reason. As the EPA

points out, "[e]very email sent or received in 2013 would necessarily contain the term '2013' in the date field, and Hall . . . later agreed to limit responsive emails to only the 2013 calendar year." Dkt. 47 at 7–8. Perhaps recognizing this fact, Hall pivots to a different point in his reply brief, arguing that "*all of the search terms*" the EPA used "were unduly restrictive" because they "would not necessarily appear in documents created by EPA Headquarters that were utilized in relation to this meeting or information transmitted to EPA Region 7 in advance of the meeting." Dkt. 42 at 7 (emphasis added). But the terms the EPA used were reasonably calculated to uncover "records and correspondence concerning the November 2013 4-States Meeting transmitted between EPA HQ and EPA Region 7." Dkt. 1-3 at 27 (Compl. Ex. 4). Hall, tellingly, does not identify what search terms the EPA should have used instead. *See* Dkt. 47 at 8 ("Hall . . . has at no point suggested alternative search terms that it believes will more effectively locate responsive records.").

Hall's remaining arguments fare no better. It contends that the EPA's search was defective because Hall has "specifically identified a number of Agency records that are presumptively responsive given the timing of their development and content" but that were not produced as part of the EPA's response. Dkt. 42 at 9. As an example, Hall points to an October 31, 2013 email between an EPA Region 7 and EPA Headquarters official entitled "NFA materials" that the EPA previously had listed as a withheld record responsive to a different request. Dkt. 36-1 at 23–24. On Hall's telling, this email would have been responsive to the Four States Meeting Request because the subject of the email, "NFA," which stands for "no feasible alternatives," was the same "issue to be discussed at the 4-States meeting." *Id.* at 24 & n. 26. Because this record was not uncovered as part of the search, Hall reasons, the search must have been defective. *Id.* at 24. In its reply, Hall identifies several other documents that were not

produced but that, in Hall's view, are "presumptively responsive" because they were created in Fall 2013 and appear to discuss the EPA's response to the *Iowa League of Cities* decision. *See* Dkt. 42 at 9. The EPA, however, has a response ready at hand. It points out that, even though the documents Hall references may relate to the same topic that was discussed at the Four States Meeting, they "have nothing to do with the Four States Meeting" itself, and thus are not responsive to Hall's request about that meeting. Dkt. 47 at 9.

The EPA has the better of the argument. Because Hall's request specifically sought records "*concerning the November 2013 4-States meeting*," Dkt. 1-3 at 27 (Compl. Ex. 4) (emphasis added), not every record that addresses the same topics that were discussed at the Four States Meeting is necessarily responsive to this request. The Court is persuaded that the EPA's search methodology, which targeted communications transmitted between EPA Headquarters and EPA Region 7 officials that made reference to the Four States Meeting, was "reasonably calculated to uncover the" records that Hall actually requested. *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C.Cir.1990). And although Hall asserts that not "every record that was developed and utilized in preparing for the Four-States Meeting would explicitly include the words 'Four-States Meeting' on the document," Dkt. 42 at 11, the EPA's supplemental search employed terms that were more expansive than this, *see* Dkt. 38-3 at 6 (Kloss Decl. ¶ 16) ("4-State*" OR "four state*" OR "Government* Affair* Meeting" OR "GA Meeting"), and Hall does not propose an alternative methodology that would reasonably identify the sought-after documents.

Hall also faults the EPA for limiting its search "to only records transmitted between Headquarters and Region 7," because the "opening background paragraph of the [request] confirms that it was seeking records regarding the announcement made by the EPA Headquarter[s] personnel at the 4-States Meeting" more generally. Dkt. 42 at 12–13. This

argument borders on frivolous: the text of Hall's request clearly states that it seeks "records and correspondence concerning the November 2013 4-States Meeting *transmitted between EPA HQ and EPA Region 7.*"  Dkt. 1-3 at 27 (Compl. Ex. 4) (emphasis added).

Finally, Hall contends that the Kloss declaration "fall[s] short of meeting the Agency's burden under FOIA and is insufficient to support the continued withholding of documents" because Kloss "does not claim to have any personal knowledge" of this particular search or state that he "spoke with any particular person to gain first hand information."  Dkt. 42 at 8–9 (internal quotation marks omitted).

This objection is unavailing.  Federal Rule of Civil Procedure 56(c)(4) sets forth the standard that an affidavit or declaration must meet for purposes of summary judgment.  It provides that "an affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  In a FOIA case, a declarant meets the standard of personal knowledge under Rule 56(c)(4) if his declaration is based on his "own personal knowledge," "information acquired by [him] through the performance of [his] official duties," or his review of "official files and records."  *Elliot v. Fed. Bureau of Prisons*, No. 04-1702, 2006 WL 52177760, at *6 (D.D.C. Oct. 17, 2006); *see also Soto v. Dep't of State*, 118 F Supp. 3d 355, 362 (D.D.C. 2015); *Bernegger v. Exec. Off. for U.S. Att'ys*, 334 F. Supp. 3d 74, 85 (D.D.C. 2018); *Woodruff v. United States*, No. 16-1884, 2020 WL 3297233, at *7 n.2 (D.D.C. June 18, 2020); *Ecological Rts Found. v. EPA*, 541 F. Supp. 3d 34, 47 (D.D.C. 2021).  The Kloss declaration satisfies this standard.  Kloss declares that "[his] responsibilities as the Director of the Water Permits Division" at the EPA "include oversight of the program staff responding to [FOIA] requests . . . related to the work of the Division," Dkt.

38-3 at 2 (Kloss Decl. ¶ 4), and that the statements in his declaration "are based upon [his] personal knowledge, information acquired by [him] while performing his official duties, information contained in records of the [EPA], and/or information supplied to [him] by current or former EPA employees," *id.* at 1 (Kloss Decl.).

Because the undisputed evidence in the record demonstrates that the EPA's search was reasonably calculated to discover the requested documents, the Court will deny Hall's motion for summary judgment with respect to the Four States Meeting Request and will grant the EPA's cross-motion for summary judgment.

**B.     The November 20, 2013 Email Request**

Hall next challenges the EPA's redaction of a single paragraph from the November 20, 2013 email.  As the EPA's *Vaughn* index explains, the November 20, 2013 email was written by Carol King, a Water Enforcement Division staff attorney, and was sent to Mark Pollins, King's manager and the Water Enforcement Division Director; Loren Denton, Supervisory Environmental Engineer; and James Zimny, Environmental Physical Scientist, copying James Vinch, a Water Enforcement Division staff attorney, and Joseph Theis, Chief of the Municipal Enforcement Branch of the Water Enforcement Division.  Dkt. 40-1 at 44 (Pollins *Vaughn* index).  The subject line of the email is "PVSC and blending (PLEASE READ)."  *Id.*  The email is three paragraphs long and begins:

> Joe, Loren and Mark,
>
> At the 11/19 meeting EPA/DOJ had with the State of New Jersey[3] re: PVSC, the state asked EPA for anything the agency has put in writing about how it's handling the 8th Circuit's *Iowa League of Cities* decision.  PVSC was not at the

---

[3] New Jersey was involved in the enforcement action with respect to PVSC because the state is delegated the authority, under the Clean Water Act, to review and approve state-issued NPDES permits, which includes PVSC's permit.  Dkt. 40-1 at 44 n.1 (Pollins *Vaughn* index).

> meeting, just the state attended.  Is there anything in writing I can share with NJDEP on this issue?

Dkt. 1-3 at 6 (Compl. Ex. 1).  The second paragraph, which occupies 8 lines of text in the email, is fully redacted.  *Id.*  The final paragraph is unredacted and reads:

> As you may recall, John Hall (and Paul Calamita) have served as PVSC's counsel.  It's not clear PVSC is still using Hall for the CSO enforcement case, but apparently, Hall remains involved on the permitting front because he recently called NJDEP about the draft PVSC permit.

*Id.*

The EPA maintains that the second, fully redacted paragraph was properly withheld under the deliberative-process, attorney-client, and attorney work-product privileges of FOIA Exemption 5, and submitted a detailed, 3-page *Vaughn* index entry describing the withheld material and setting forth the applicability of the three privileges.  *See* Dkt. 40-1 at 44–46 (Pollins *Vaughn* index).  This detailed entry is characteristic of the laudable *Vaughn* indices, which span 766 pages, which the EPA prepared and produced in this case.

With respect to the deliberative-process privilege, the *Vaughn* index explains that "[t]he withheld information is 'pre-decisional' because that information was generated as EPA considered judicial and administrative Clean Water Act enforcement action against PVSC," and, "[a]t the time the email was generated, EPA, U.S. Department of Justice (DOJ), and New Jersey were pursuing a judicial enforcement action against PVSC's violations of its NPDES Clean Water Act Section 309(b)."  *Id.* at 44 (Pollins *Vaughn* index).  The index further explains that "[t]he withheld paragraph is deliberative" in that it "constitutes an exercise of judgment by the author" who "identifies and distills key information from ongoing discussions with New Jersey on the PVSC administrative enforcement action" and "contains the staff attorney's analysis of how the information affects the administrative enforcement action and recommendations for how to proceed."  *Id.* at 45 (Pollins *Vaughn* index).

The redacted paragraph is also attorney-client privileged, according to the EPA, because it "comprises confidential communications between Office of Enforcement and Compliance Assurance attorneys and technical staff that relate to legal issues, strategies and decisions concerning an approach being considered by EPA for its PVSC enforcement action." *Id.* The *Vaughn* index explains that the "withheld portions of the email string are confidential, were shared only with EPA employees who had a need-to-know[,] and have not been widely disseminated throughout the Agency." *Id.*

Finally, the EPA contends that the redacted information is also protected by the attorney work-product privilege "because it was generated in reasonable anticipation of a civil judicial enforcement action." *Id.* According to the *Vaughn* index, at the time the email was written, "EPA had referred a Clean Water Act case against PVSC to DOJ, and at that time, judicial and/or administrative enforcement action was highly likely." *Id.*

Hall gives several reasons why, in its view, the EPA's withholdings were improper. First and foremost, Hall maintains that the redacted paragraph cannot be shielded by Exemption 5 because it sets forth the "working law" of the agency with regard to the regulation of blending outside the Eighth Circuit—a decision that Hall says had already been reached by the time of the email. *See* Dkt. 42 at 18. If that were so, then Hall would have a point. Hall's argument falters, however, because neither the unredacted portions of the email nor the detailed description of the paragraph in the agency's *Vaughn* index suggests that the paragraph sets forth the agency's working law. Indeed, the *Vaughn* index expressly refutes Hall's supposition, explaining that the withheld material "contains the author's opinions and legal analysis" and does not reflect any "final agency decision or policy." Dkt. 40-1 at 45.

Hall presses on, arguing that two background facts establish that the redacted paragraph must set forth the agency's working law: (1) the fact that the unredacted first paragraph mentions the request from the State of New Jersey "for anything the agency has put in writing about how it's handling the . . . *Iowa League of Cities* decision," Dkt. 1-3 at 6 (Compl. Ex. 1), and (2) the fact that the November 20, 2013 email was originally produced to Hall in response to an earlier FOIA request that asked for "any documents explaining how . . . blending . . . will be addressed in permitting and enforcement actions within the [Eighth] Circuit versus outside the [Eighth] Circuit," Dkt. 42 at 18–19.  Neither fact, however, calls into question the agency's characterization of the redacted material, which is entitled to a presumption of good faith.  *See SafeCard Servs., Inc.*, 926 F.2d at 1200 ("Agency affidavits are accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." (internal quotation marks omitted)).  With respect to the first point, Hall appears to misread the unredacted portion of the email, which does not indicate that the redacted portion responds to New Jersey's request and instead asks the email's *recipients* to provide that information.  *See* Dkt. 1-3 at 6 (Compl. Ex. 1).

Hall's other argument also fails for a few reasons.  First, nothing in the *Vaughn* index supports Hall's contention that the redacted paragraph contains a statement of the agency's position on blending.  Hall can only speculate that the redacted portion of the email was responsive to its earlier FOIA request seeking documents explaining how blending would be addressed, rather than the unredacted first paragraph, which sets forth New Jersey's *request* for that information.  Second, Hall mistakenly assumes that any record that "explain[s]" how blending will be addressed in future enforcement actions would necessarily set forth the working law of the agency.  Hall is correct that Exemption 5 does not shield "*opinions* and *interpretations*

which embody the agency's effective law and policy," or "communications that implement an established policy of an agency." *Hall & Associates*, 2021 WL 1226668, at *5 (emphasis added) (first quoting *Sears*, 421 U.S. at 153, then quoting *Tax'n With Representation Fund*, 646 F.2d at 667). But the exemption nevertheless shields a staffer's "suggestions," "recommendations," "advice to a superior," or "suggested dispositions of a case." *Coastal States Gas Corp.*, 617 F.2d at 867–68 (collecting cases). Here, nothing in the *Vaughn* index indicates that the redacted paragraph includes a statement of the working law of the agency. Instead, the index explains that the redacted paragraph "constitutes an exercise of judgment by the author" who "identifies and distills key information from ongoing discussions with New Jersey on the PVSC administrative enforcement action" and "contains the staff attorney's analysis of how the information affects the administrative enforcement action and recommendations for how to proceed." Dkt. 40-1 at 45 (Pollins *Vaughn* index). Hall's argument ignores that detailed description of the redacted paragraph.

More generally, Hall takes an overly expansive view of the "working law" doctrine, assuming that any statement that describes the agency's existing policies is working law and thus outside the scope of Exemption 5. *See, e.g.*, Dkt. 36-1 at 31–33. This is so, Hall seems to believe, regardless of where a statement appears and how it is employed. *See id.* But the test for whether information constitutes the "working law" of an agency is more discriminating than Hall suggests. Critically, "working law," as that term has been applied by the Supreme Court and the D.C. Circuit, generally refers to documents that carry some measure of authoritative weight within the agency, not to isolated sentences or facts included within a larger record that is not intended to convey or to implement settled agency policy.

Correctly understood, then, the inquiry into whether a document contains "working law" often focuses as much on the "the function and significance of the document in the agency's decisionmaking process" as it does on the substance of the document's statements. *Tax'n With Representation Fund*, 646 F.2d at 678. Courts must ask, for example, how the documents at issue are used: Are they "intended to guide and direct subordinates in analogous cases?" *Coastal States Gas Corp.*, 617 F.2d at 867. Are they "viewed as having precedential import?" *Id.* Are they "intended to have effect upon actions of others in the agency?" *Id.* Are they, in effect, "a body of 'secret law' used by [the agency] in the discharge of its regulatory duties and in its dealings with the public?" *Id.* If so, such documents likely constitute working law. But by the same token, not every document that contains some passing reference to an established policy or rule (even if created or used for a distinct, deliberative purpose) constitutes the working law of the agency. The working law doctrine does not mean, for example, that FOIA requires the Department of Justice to review (and to release, in part) prosecution memoranda prepared by line attorneys merely because those memoranda may—in passing or by way of background—include references to the Principles of Federal Prosecution or to a position that the Department has already taken before the court.

This limitation makes sense in light of the doctrine's purpose, which the Supreme Court set forth in *Sears*. There, the Court explained:

> The public is vitally concerned with the reasons which did supply the basis for an agency policy actually adopted. These reasons, if expressed within the agency, constitute the "working law" of the agency and have been held by the lower courts to be outside the protection of Exemption 5 . . . .
>
> This conclusion is powerfully supported by the other provisions of the Act. The affirmative portion of the Act, expressly requiring indexing of "final opinions," "statements of policy and interpretations which have been adopted by the agency," and "instructions to staff that affect a member of the public," 5 U.S.C. § 552(a)(2), represents a strong congressional aversion to secret (agency) law and represents an affirmative congressional purpose to require disclosure of

> documents which have the force and effect of law.  We should be reluctant,
> therefore, to construe Exemption 5 to apply to the documents described in 5
> U.S.C. § 552(a)(2); and with respect at least to final opinions, which not only
> invariably explain agency action already taken or an agency decision already
> made, but also constitute final dispositions of matters by an agency, we hold that
> Exemption 5 can never apply.

421 U.S. at 152–54 (cleaned up).  The *Sears* Court's invocation of § 552(a)(2) is notable.  That

provision requires agencies to "make available for public inspection in an electronic format" all

"final opinions . . . , as well as orders, made in the adjudication of cases" as well as "those

statements of policy and interpretations which have been adopted by the agency and are not

published in the Federal Register."  5 U.S.C. § 552(a)(2)(A)–(B).  The fact that FOIA requires

the agency systematically to index information of this kind suggests that the working law

doctrine is intended to cover only those documents (or substantial portions of documents) that

carry a level of significance within the agency, and not passing statements in documents that are

not intended to guide or direct agency action or proceedings.  To be sure, statements that refer to

agency policy may themselves constitute post-decisional, nondeliberative, nonconfidential

factual material that is not privileged.  But the key distinction between statements of that sort and

information that is covered by the working law doctrine is that "working law" is never protected

by Exemption 5, *Sears*, 421 U.S. at 153–54, whereas factual statements can be covered by the

deliberative process privilege if they are "inextricably intertwined" with or not reasonably

segregable from privileged material, *Protect Democracy Project, Inc.*, *v. U.S. Dep't of Health &*

*Hum. Servs.*, 569 F. Supp. 3d 25, 40 (D.D.C. 2021).

Pressing this latter point, Hall observes that any references to the EPA's future approach

to blending in the redacted paragraph are necessarily post-decisional—and thus not subject to the

deliberative process privilege—because the EPA had already announced its decision to non-

acquiesce to the Eighth Circuit's decision the day before the November 20, 2013 email was sent.

32

*See* Dkt. 42 at 20.  But that observation, once again, ignores the description of the redacted

paragraph contained in the *Vaughn* index.  Dkt. 40-1 at 44–46.  The Vaughn index explains that

"the withheld information" includes a staff attorney's identification and distillation of "key

information from ongoing discussions with New Jersey on the PVSC administrative enforcement

action," along with "the staff attorney's analysis of how the information affects the

administrative enforcement action and recommendations for how to proceed."  *Id.* at 45.  That is

core deliberative-process material as it pertains to the ongoing enforcement action, and this Court

has made clear that the deliberative-process privilege is decision-specific.  *Hall & Assocs.*, 2021

WL 1226668, at *4 ("A document may . . . postdate the EPA's purported non-acquiescence

decision but also contain deliberations on related or other matters worthy of protection.").  Here,

the *Vaughn* index indicates that the redacted paragraph "contain[s] deliberations" on "other

matters worthy of protection"—namely, the PVSC enforcement action.  *Id.*

Hall's further contention that the redacted paragraph is not attorney work product because

the PVSC enforcement action did not concern a blending violation, *see* Dkt. 42 at 21–22, fares

no better.  The Pollins declaration attests, under penalty of perjury, that the redacted paragraph

"was generated in reasonable anticipation of a civil judicial enforcement action" and, to that end,

comprised "confidential communications" relating "to legal issues, strategies[,] and decisions

concerning an approach being considered by EPA for its PVSC enforcement action."  Dkt. 40-1

at 19–20.  Once again, these statements are "accorded a presumption of good faith."  *SafeCard

Servs., Inc.*, 926 F.2d at 1200.  Nor is the Court persuaded by Hall's inference.  To the contrary,

even if the alleged violation did not involve blending, that does not mean that consideration of

the question of blending was unrelated to a possible enforcement action and the nature and scope

of an appropriate enforcement order.  And, even if the redacted paragraph does mention blending

in the context of the EPA's contemplated enforcement action, "any part of a document prepared in anticipation of litigation, not just the portions concerning opinions, legal theories, and the like, is protected by the work product doctrine and falls under Exemption 5." *Jud. Watch, Inc.*, 432 F.3d at 371 (cleaned up). The EPA was therefore not required to segregate out any discussion of blending. *See id.*

Finally, Hall maintains that the Court should order the EPA to release the November 20, 2013 email because, in its view, the document is "no different" from an email that then-Judge Ketanji Brown Jackson determined was not predecisional because it did "not precede the decision to which it relate[d]." *See* Dkt. 42 at 18 (discussing *Hall & Assocs. v. EPA*, 315 F. Supp. 3d 519, 537 (D.D.C. 2018), *vacated and remanded on other grounds*, 956 F.3d 621 (D.C. Cir. 2020)). But Hall provides no basis for his claim that the email that Judge Jackson ordered released and the November 20, 2013 email are "no different" from each other, and, indeed, the EPA's whole point is the opposite. As it argues, the record that Judge Jackson ordered released is distinguishable because it "concern[ed] the EPA's application of *Iowa League of Cities* generally," whereas the paragraph redacted in this matter involves an attorney's distillation of key facts, legal analysis, and recommendations concerning "a specific, nonfinal enforcement action against the Passaic Valley Sewerage Commission" and thus constitutes predecisional, deliberative, client confidential, attorney work product. Dkt. 38-1 at 33. Because Hall conflates the EPA's *general* non-acquiescence decision on November 19, 2013, with the EPA's strategy and decisionmaking concerning the ongoing PVSC enforcement action, the EPA prevails on this point.

Accordingly, the Court will deny Hall's motion for summary judgment with respect to this issue and will grant the EPA's cross-motion for summary judgment.

C.      **The Peak Flows Management Rulemaking Request**

Hall next challenges the EPA's Exemption 5 withholdings from the response to the Peak

Flows Management Rulemaking Request, Dkt. 36-1 at 30, which sought records related to the

EPA's *contemplated* regulatory action concerning peak water flows management during wet

weather events, *see* Dkt. 38-3 at 8 (Kloss Decl. ¶ 21); Dkt. 1-3 at 9–10 (Compl. Ex. 2).  As the

EPA explains in its declaration, the EPA withheld nine records in part and ten records in full

pursuant to the deliberative-process and attorney-client privileges.  Dkt. 38-3 at 15 (Kloss Decl.

¶ 41).  According to the EPA, the withheld material falls into two categories: (1) briefing records

and (2) records related to planning for a proposed rule concerning peak flows management.  *Id.*

The first category—briefing records—covers ten records: (1) five draft PowerPoint

presentations prepared by Water Permits Division staff (with input from attorneys in the Office

of General Counsel) to brief EPA senior managers and staff on blended discharge from sewage

treatment plants (Documents 1–5); and (2) five draft briefing documents prepared by Office of

General Counsel attorneys and Water Permits Division staff that "address the proposed

rulemaking and recommended regulatory action relating to blended discharges (Documents 6, 7,

10, 11, and 14)."  *Id.* at 15 (Kloss Decl. ¶ 42).  The EPA maintains that the withheld information

in each of these documents is subject to the deliberative-process privilege because it is intra-

agency material prepared by "attorneys and Water Permits Division staff and managers as they

planned for a rulemaking process."  *Id.* at 16 (Kloss Decl. ¶ 43).  The documents are

predecisional, the EPA asserts, because the documents "were integral to the staff development of

options for the proposed rule and management's consideration and selection of potential

rulemaking options, which occurred before the publication of the proposed rule."  *Id.*  And the

withheld information is deliberative, the EPA explains, because it "comprises staff opinions,

analysis, recommendations, and proposals on these matters, and was created for the purpose of facilitating consideration and discussion during the rulemaking decision-making process." *Id.* The EPA further contends that all but one of the withholdings in this first category are subject to the attorney-client privilege. *Id.* (Kloss Decl. ¶ 44). The Kloss declaration attests that the redacted material "was exchanged between and drafted by attorneys within the Office of the General Counsel and their program clients in the Office of Water" and that it "contains legal advice, perspective[,] and opinions conveyed by attorneys to their clients about updates to the NPDES regulations relating to blended discharges." *Id.*

The second category of records—planning documents for a potential rulemaking— consists of nine records: (1) two draft regulatory agendas for the potential rule, entitled "Updates to Wet Weather Treatment Regulations for POTWs" (Documents 9 and 12); (2) two draft planning spreadsheets that address the potential processes and estimated resource needs for the rulemaking (Documents 8 and 13); and (3) five draft analytic blueprints for the potential rulemaking related to blended discharges from POTWs (Documents 53, 54, 55, 56, and 59). *Id.* at 17 (Kloss Decl. ¶ 45). According to the Kloss declaration, the withheld information in this category is subject to the deliberative-process privilege because it is either intra-agency material prepared by Water Permits Division staff as they evaluated whether to undertake a rulemaking process (in the case of Documents 8, 9, 12, and 13) or material that identified the technical and economic analyses that would be required to support the rulemaking (in the case of Documents 53, 54, 55, 56, and 59). *Id.* (Kloss Decl. ¶ 46). The EPA asserts that the documents are predecisional because they "were generated during the early planning stages and prior to any publication of the proposed rule." *Id.* The agency also argues that the withheld material is deliberative because it includes "proposals for the rulemaking that were shared with other EPA

staff and managers involved in the rulemaking" and "opinions on specific issues, analysis of resource needs, expectations of what the effort will entail, and tentative schedules for the regulatory development." *Id.* at 17–18 (Kloss Decl. ¶ 46). The Kloss declaration further attests that the withheld records "do[] not reflect any final [a]gency decision or policy." *Id.* at 17 (Kloss Decl. ¶ 46).

Hall lodges several objections to the EPA's withholdings. First and foremost, Hall asserts that the EPA may not withhold final "intermediate decisions" regarding the rulemaking or documents reflecting EPA's working law, Dkt. 36-1 at 32, because "recitation[s] of existing [a]gency policy" are "purely factual information that may never be withheld," Dkt. 42 at 26. Hall complains that the EPA nevertheless failed to "provide[] a single record that states EPA's current policy position on blending in response to the Peak Flows Management Rulemaking Request," Dkt. 42 at 25; *see also* Dkt. 36-1 at 32, even though—in Hall's view—"[a]ll of the withheld records, including EPA's rulemaking package to OMB (that EPA completely withheld), would certainly contain such information," Dkt. 36-1 at 32.

For the reasons explained above, the Court is unpersuaded that the briefing records and planning documents constitute the working law of the agency. As detailed in the Kloss declaration and accompanying *Vaughn* index, Dkt. 38-3 at 15-17 (Kloss Decl. ¶¶41-46); *id.* at 47–81, the withheld materials were not used to guide or direct agency action or proceedings— they did not constitute a body of secret law used by the agency to discharge its responsibilities in dealing with regulated parties or the public. The materials, instead, were generated to "facilitate[e] consideration and discussion during [a] rulemaking decision-making process," *id.* at 16 (Kloss Decl. ¶ 43), and "as part of the planning process for a rulemaking," *id.* at 17 (Kloss Decl. ¶ 46). But even if the records do not constitute the working law of the agency, Hall is

correct that the deliberative process privilege does not protect "purely factual information" that is segregable and that does not reveal the opinions, analyses, or recommendations of agency staff. Dkt. 42 at 26; *see also Morley v. CIA*, 508 F.3d 1108, 1127 (D.C. Cir. 2007) (factual material that does not disclose the deliberative process is not protected under the deliberative process privilege). So insofar as the withheld material merely sets forth the then-existing EPA policy regarding blending, that material may well fall beyond the scope of the deliberative process privilege. In addition, although the attorney-client privilege protects factual information provided by a client to her attorney (in confidence) for purposes of obtaining legal advice, *see Pub. Employees for Env't Resp. v. EPA*, 211 F. Supp. 3d 227, 233 (D.D.C. 2016), the EPA's Vaughn index invokes the attorney-client privilege "in part," without indicating which "parts" are covered, *see*, *e.g*., Dkt. 38-3 at 48.

To the extent that Hall speculates that "[a]ll of the withheld records, including EPA's rulemaking package to OMB . . . , would certainly contain" factual information regarding "the current regulatory position that the proposed rule would be amending," Dkt. 36-1 at 32, the Court is unpersuaded. That sweeping assertion once again ignores the descriptions of the withheld material in the Kloss declaration and the *Vaughn* index, which includes several pages of justification for each document. *See* Dkt. 38-3 at 47–81. It therefore constitutes little more than unsupported surmise. The Court notes, moreover, that—despite Hall's suggestion to the contrary—the EPA *did* release some of the records in full and segregable portions of others. Dkt. 38-3 at 11-12 (Kloss Decl. ¶¶ 29-34).

Hall does, however, raise one, more substantial contention. It notes that the EPA's *Vaughn* index reports that the withheld material included "opinions and analysis of the effectiveness of current regulations." *See* Dkt. 42 at 27 (quoting ED_002113B_00000056); *see*

*also* Dkt. 38-3 at 47–79 (Docs. 1–7, 14, 54–56).[4]  Although the agency was entitled to withhold

the opinions and analyses of staff prepared in the course of agency deliberations, these entries

suggest that the records at issue likely contained *some* factual description of the then-existing

(final) regulations and policies.  To be sure, "Congress enacted Exemption 5 to protect the

executive's deliberative processes—not to protect specific materials," and, thus, the Court must

"focus less on the nature of the materials sought and more on the effect of the materials' release."

*Dudman Commc'ns Corp. v. Dep't of the Air Force*, 815 F.2d 1565, 1568 (D.C. Cir. 1987).  The

release of factual information, for example, can occasionally "reveal much" about an agency's

decisionmaking process, *id.*, and factual information that is "inextricably intertwined," *Protect*

*Democracy Project, Inc.*, 569 F. Supp. 3d at 40, with the agency's internal deliberations such

that its disclosure "will expose [the] agency's decisionmaking process" will generally be

protected by the deliberative-process privilege, *id.* at 39 (alteration in original) (quoting *Dudman*

*Commc'ns*, 815 F.2d at 1568).  The problem is that neither the EPA's declarations nor its

*Vaughn* index provide the Court with sufficient information to determine whether these eleven

records contain any purely factual material—describing the then-existing EPA policy regarding

blending—that is segregable and that can be disclosed without revealing internal, agency

deliberations regarding future EPA policy regarding blending.

To assist the Court in determining whether portions of these eleven documents were

properly "withheld under" Exemption 5, the Court will order the EPA to provide redacted and

unredacted versions of the documents to the Court for *ex parte*, *in camera* review pursuant to 5

U.S.C. § 552(a)(4)(B).  Because Hall is "clear" that it seeks only "specific purely factual

---

[4] Although Hall's brief cites to a slightly different group of documents, Dkt. 42 at 27, a review of
the *Vaughn* index demonstrates that the relevant documents are those to which the Court cites
above.

information regarding [the] EPA's [then-]current regulatory position on blending," Dkt. 42 at 26,

the Court need not consider any of Hall's remaining arguments at this point.  As far as the Court

can discern from the existing record, the eleven documents that it will examine *in camera* are the

only records sought pursuant to the Peak Flows Management Rulemaking Request that even

arguably contain any such factual information.  If the Court determines that the records contain

any purely factual material, it will provide the parties with the opportunity to address whether

that material is segregable or otherwise subject to withholding.

**D.     The Enforcement Orders Request**

        That leaves the parties' cross-motions for summary judgment with respect to the

Enforcement Orders Request.  This request, as clarified, sought records that have the effect of an

order and (1) classify blending as a bypass and/or (2) indicate that blending may be implemented

as an interim measure, as well as (3) records "discussing" the administrative order regarding the

Passaic Valley Sewerage Commission.  Dkt. 40-1 at 4 (Pollins Decl. ¶ 8); Dkt. 1-3 at 66–67

(Compl. Ex. 12).  The EPA located no responsive records to parts one and two of the request

after conducting a search for responsive orders in three public databases.  Dkt. 40-1 at 5 (Pollins

Decl. ¶ 10).  In response to part three of the request, the EPA ultimately released 72 records in

full and 223 records in part and withheld 153 records in full.  *Id.* at 7 (Pollins Decl. ¶ 15).  Hall

challenges both the EPA's search with respect to parts one and two of the request—which

yielded no responsive documents—and the EPA's Exemption 5 withholdings from its response

to part three.  The Court will address each of these challenges in turn.

        1.   *Adequacy of the EPA's Search as to Parts One and Two*

        Hall first challenges the adequacy of the EPA's search for records responsive to parts one

and two, which yielded zero results.  Hall fails to identify any defect with the agency's stated

methodology: it does not point to any different search terms the agency should have employed,

nor does it argue that the EPA should have searched any different databases.  Rather, Hall insists

that it is "impossible" that the EPA's search found no enforcement orders that either "classif[y]

blending as a bypass" or "indicate blending may only be implemented as an interim measure"

because, according to Hall, by the time period covered by the request (June 14, 2015 to June 14,

2018), the EPA had already determined that "blending must continue to be regulated as a bypass

outside the Eighth Circuit."  Dkt. 36-1 at 33.  Hall further asserts that responsive orders must

exist because several documents that the EPA has otherwise released to Hall indicate that, after

the *Iowa League of Cities* decision, the EPA compiled lists of existing orders that precluded

bypassing.  *See id.* at 34.  In particular, Hall singles out one document that identifies five federal

"enforcement orders that regulate blending scenarios at POTWs as a bypass," *id.* at 33 n.38

(citing Dkt. 36-2 at 346 (Pl.'s Ex. 36)), and it argues that the Passaic Valley Sewerage

Commission administrative order was clearly responsive to the request but was not turned over,

*id.*  All this leads Hall to conclude that the EPA has either conducted an "insufficient search" or

acted in bad faith by "purposeful[ly] refus[ing] to identify responsive records."  *Id.* at 34.

       In response, the EPA says that there is a perfectly reasonable explanation why none of the

five federal enforcement orders identified in Plaintiff's Exhibit 36 came up in its search: Hall's

FOIA request was dated June 14, 2018, and only requested orders and actions "within the past 3

years."  Dkt. 39 at 41 (quoting Dkt. 40-1 at 3 (Pollins Decl. ¶ 6)).  Each of the consent decrees

listed on the document listing the five federal enforcement orders, the EPA explains, predated the

June 2015 to June 2018 time frame, and, therefore, none was responsive to Hall's request.  *Id.* at

40–41.  In response to this argument, Hall observes that, by the EPA's own admission, its Blue

Plains consent decree was modified in 2015, and thus should have been responsive.  Dkt. 42 at

30.  But the EPA again has an effective rebuttal: that consent decree was modified in May 2015,

while the date range for Hall's FOIA request began in June 2015.  Dkt. 47 at 18.  The EPA

further notes that it did, in fact, turn over the Passaic Valley Sewerage Commission

administrative order to Hall (which, the EPA notes, Hall had attached to its request), it just did so

as part of its response to part three, which specifically concerned that order.  Dkt. 47 at 18.

The EPA has the better of it.  As with its other adequacy challenges, Hall does not

meaningfully contest the EPA's search methodology and instead complains about the outcome of

the search.  Challenges to a search based on disappointing or unexpected results, however, can

only provide a basis for denying summary judgment if Hall presents "countervailing evidence"

that "raises substantial doubt" as to the adequacy of the agency's search.  *Iturralde*, 315 F.3d at

314 (internal quotation marks omitted).  Hall's efforts to carry that burden fall short in light of

the EPA's response and the presumption of good faith to which the agency's declaration is

entitled.

       2.    *EPA's Exemption 5 Withholdings as to Part Three*

That brings the Court to Hall's challenge to the EPA's withholdings from documents

responsive to part three of the Enforcement Orders Request.  This category, as narrowed during

discussions between Hall and the EPA, sought any records "discussing" the Passaic Valley

Sewerage Administrative Order on Consent.  Dkt. 40-1 at 4 (Pollins Decl. ¶ 8).  In response, the

EPA searched the email accounts of ten custodians from the Water Enforcement Division, the

Water Law Office of the Office of General Counsel, and Region 2's Office of Regional Counsel,

who were identified as the individuals most likely to be in possession of responsive records.  *Id.*

at 6 (Pollins Decl. ¶ 11).  The search applied a June 14, 2015 to June 14, 2018 date range and the

key words "PVSC" OR "Passaic Valley Sewerage Commission" OR "Passaic Valley Sewer

Commission."  *Id.*  Ultimately, the agency released 72 records in full and 223 records in part and

withheld 153 records in full pursuant to Exemptions 5 and 6. *Id.* at 7, 8 (Pollins Decl. ¶¶ 15, 22). Hall challenges only the agency's withholdings pursuant to Exemption 5.

As explained in the Pollins declaration, the withheld material falls into three categories: (1) drafts of the PVSC administrative order on consent, (2) emails discussing or transmitting a draft of the order, and (3) documents that address the order. *Id.* at 9 (Pollins Decl. ¶ 24). The first category consists of 55 drafts of the administrative order on consent. *Id.* (Pollins Decl. ¶ 25). In its motion for summary judgment, Hall concedes that it is no longer "seeking any drafts or versions of the administrative order as those documents most likely contain some form of protected material." Dkt. 36-1 at 36 n.41.

The second category of withholdings consists of approximately 300 emails that discuss or transmit copies of a draft of the PVSC administrative order on consent that were withheld in full or in part pursuant to the deliberative-process, attorney-client, and attorney-work-product privileges. Dkt. 40-1 at 11–12 (Pollins Decl. ¶ 30). Pollins attests that the withheld emails are protected under the deliberative-process privilege because they were "communications prepared by and shared amongst staff and managers" in the EPA and the Department of Justice "as they drafted the Administrative Order on Consent," and they "comprise[] staff opinions, analysis, recommendations, and proposals on the draft Order." *Id.* at 12 (Pollins Decl. ¶ 31). The 729-page *Vaughn* index attached to the Pollins declaration includes further, document-specific justifications for each email. *See id.* at 44–772 (Pollins *Vaughn* index).

The EPA also asserts that the withheld email content is subject to the attorney-client privilege because the emails "were exchanged between and drafted by attorneys" within the EPA and Department of Justice "in order to present a complete draft for Water Enforcement Division managers' and decision makers' review" and contain "legal advice, perspective, and opinions

conveyed by attorneys to their clients about the draft order." *Id.* at 12–13 (Pollins Decl. ¶ 32). The EPA's declarant attests that "[t]he withheld email material has remained confidential and was only circulated among the EPA and U.S. Department of Justice employees whose area of responsibility included the proposed order." *Id.* at 13 (Pollins Decl. ¶ 32). Here, too, the agency's *Vaughn* index includes further document-specific justifications for each email. *Id.*

The third category of withholdings consists of approximately 25 records—such as briefing documents, weekly enforcement updates, fact sheets that present background, notes and suggestions on the PVSC enforcement process, and dockets containing statuses of ongoing enforcement matters—that address the PVSC administrative order on consent but are not drafts of the order. *Id.* at 15 (Pollins Decl. ¶ 36). The agency withheld all of these documents under the deliberative-process privilege, and some under the attorney-client and attorney work-product privileges. *Id.* at 15–16 (Pollins Decl. ¶¶ 38–40). The agency's *Vaughn* index addresses each of the records in detail.

Hall raises several objections to the EPA's withholdings. First, Hall asserts that the EPA is improperly withholding records that discuss the agency's position on blending. Hall explains that on August 29, 2018, it clarified its FOIA request to seek *only* "copies of PVSC-related records that discuss how or whether blending would be regulated as a bypass." Dkt. 36-1 at 34 (citing Dkt. 1-3 at 73 (Compl. Ex. 13)). That clarification is significant, Hall contends, because by the time all responsive records were produced, the EPA had already reached its decision not to apply the Eight Circuit's decision (at a minimum) in New Jersey, where PVSC is located, and thus any discussion of blending in relation to the PVSC constitutes working law that is not protected by any of the Exemption 5 privileges. *Id.* at 34–36.

Against this backdrop and in what it describes as an effort to facilitate judicial review, Hall identifies two groups of documents that, it claims, "are certainly not protected by . . . Exemption 5 . . . and must be released." Dkt. 36-1 at 36. The first group of records, which Hall has consolidated and attached as Exhibit 29 to its motion for summary judgment, consists of 40 pages of redacted emails between the EPA Office of Water's ("OW") Water Permits Division and the Office of General Counsel during the early stages of the PVSC administrative order discussions. *Id.* at 37; *see* Dkt. 36-2 at 238–78 (Pl.'s Ex. 29). According to Hall, these records are improperly redacted because "OW permitting staff do not create new NPDES policies for enforcement decisions" and, in these emails, the OW staff were simply confirming how the existing law and interpretation of the NPDES regulations regarding bypasses apply to facilities outside the Eighth Circuit"—a decision the EPA had already made and rendered publicly on multiple occasions. Dkt. 36-1 at 37 (emphasis omitted). Because under the working law doctrine an agency "may not withhold information that states or implements an already rendered regulatory decision," Hall argues, the EPA cannot redact these emails pursuant to Exemption 5. *Id.* (emphasis removed) (citing *Jordan v. U.S. Dep't of Just.*, 591 F.2d 753, 774 (D.C. Cir. 1978)).

Hall's position would have considerable force if it were correct that the only records at issue are "PVSC-related records that discuss how or whether blending would be regulated as a bypass." Dkt. 36-1 at 34. As the EPA explains, however, Hall's assumption is mistaken; it is incorrect that all the responsive records "discuss how or whether blending would be regulated as a bypass." Dkt. 38-1 at 44. Rather, the EPA explains, the EPA was already well into its search and review for responsiveness at the time Hall sent its August 29, 2018 clarification. As a result, the EPA did not narrow its search, and it instead produced to Hall "all records that discuss the

enforcement order"—not just records discussing whether blending would be regulated as a prohibited bypass. *Id.* (emphasis added).

That being said, at least some of the records from this first group of documents that Hall asks the Court to review do appear to discuss blending or bypassing in some capacity—in particular, Documents ED_001856_00000105, ED_001856_00000166, ED_001856_00003488, ED_001856_00003800, ED_001856_00012741, ED_001856_00012953, and ED_001856_00012958.[5] Dkt. 40-1 at 56–57, 60–61, 112–13, 252–53, 482–83, 532–33, 534–35 (Pollins *Vaughn* index). The Court is unpersuaded that these references mean that the documents constitute working law and thus fall entirely outside of Exemption 5. Nevertheless, upon review of the corresponding *Vaughn* index entries for these documents, the Court is unable to ascertain whether any purely factual statements regarding the agency's existing policy toward blending and bypass may be present in these communications, and, if so, whether such statements are either (1) reasonably segregable from the surrounding exempt material or (2) inextricably intertwined with exempt material such that they remain covered by Exemption 5. Thus, out of an abundance of caution, the Court will deny both parties' motions for summary judgment with respect to these records and order the EPA to provide the Court with redacted and unredacted copies of the records for *ex parte*, *in camera* review. *See Ctr. for Auto Safety v. EPA*, 731 F.2d 16, 20–21 (D.C. Cir. 1984).

The second group of records that Hall asks the Court to review consists of 40 pages of emails between the EPA and the Office of the Solicitor General at the Department of Justice. *See* Dkt. 36-2 at 302–342 (Pl.'s Ex. 34). According to Hall, these communications were created

---

[5] Documents ED_001856_00000010 and ED_001856_00000031 from this group also reference blending or bypass, but in response to Hall's motion for summary judgment, the EPA released these records to Hall. *See* Dkt. 42 at 41 & n.29.

to "inform the Solicitor General's Office about the regulatory position being applied in the PVSC action"—that is, whether "this action shows [the EPA] does not adhere to Iowa League of Cities outside the Eighth Circuit." Dkt. 36-1 at 39; *see also* Dkt. 36-2 at 310 (Pl.'s Ex. 34). The email chain was prompted by a brief opposing certiorari that the Justice Department submitted to the Supreme Court in 2018, in which, according to Hall, the Solicitor General took the position that the agency adhered to *Iowa League of Cities* outside the Eighth Circuit. *See* Dkt. 36-2 at 310 (Pl.'s Ex. 34). Hall claims that the withheld material in this email chain is not exempt from disclosure because it contains a purely factual statement concerning "what regulatory actions had already been undertaken." Dkt. 42 at 36; *see* Dkt. 36-1 at 39.

Although the accuracy of Hall's characterization of the Solicitor General's brief is not directly at issue, the Court notes at the outset that it has reviewed the brief in question, and the brief does not say what Hall attributes to it. The Solicitor General did not represent to the Supreme Court that the EPA adhered to *Iowa League of Cities* outside the Eighth Circuit. Brief for the Respondent in Opposition at 9 n.3, *Ctr. For Regul. Reasonableness v. EPA*, 138 S. Ct. 1041 (2018) (No. 17-334) ("Although the court of appeals read EPA's letters as 'indicating' that EPA interpreted *Iowa League of Cities* as binding only in the Eighth Circuit, EPA stated only that it *did* regard *Iowa League of Cities* as binding in the Eighth Circuit, without addressing the more complicated question whether *Iowa League of Cities* controls in other circuits."); *id.* at 14 (similar).

In any event, taken on its terms Hall's argument is not a bad one, and if only the deliberative-process or attorney-client privileges were at play, the Court might order the EPA to submit the relevant documents for *ex parte*, *in camera* review. The Court will decline to do so, however, because these records are also protected by the attorney-work-product privilege. As

discussed, in the FOIA context, the attorney-work-product privilege differs from the

deliberative-process privilege in that the work-product doctrine "does not distinguish between

factual and deliberative material." *Jud. Watch, Inc.*, 432 F.3d at 371 (internal quotation marks

omitted).[6]  Thus, "any part of a document prepared in anticipation of litigation, not just the

portions concerning opinions, legal theories, and the like, is protected by the work product

doctrine and falls under [E]xemption 5," and, thus, "segregability is not required." *Id.* (cleaned

up).  Here, the statements Hall seeks between the EPA and the attorneys with the Office of the

Solicitor General were plainly prepared in anticipation of ongoing litigation before the Supreme

Court, and, therefore, they fall within the protection of the work-product privilege.  As the EPA's

*Vaughn* index indicates, "[t]he withheld material was not prepared in the agency's ordinary

course of business but rather was created because of the ongoing civil litigation," and "[a]ny

factual work-product or factual material was included in the withheld material as part of the

attorney's work to determine whether to amend the Government's filing" before the Supreme

Court.  Dkt. 40-1 at 130 (Pl.'s Ex. 34).  Hall does not meaningfully rebut this argument in its

---

[6] The third privilege typically invoked under Exemption 5—the attorney-client privilege—raises its own distinct issues.  The D.C. Circuit has explained that the attorney-client privilege covers "communication[s] [that] relate[] to a fact of which the attorney was informed . . . by his client." *In re Sealed Case*, 737 F.2d at 99 (quoting *United States v. United Shoe Machinery Corp.*, 89 F. Supp. 357, 358–59 (D. Mass. 1950)); *see also Vento v. I.R.S.*, 714 F. Supp. 2d 137, 151 (D.D.C. 2010) ("Plaintiffs also argue that factual information should be segregated and disclosed.  On this point, plaintiff is incorrect.  Factual information provided by the client to the attorney is the essence of the privilege." (internal citation omitted)).  That said, the privilege does not cover facts conveyed by an attorney to her client when such facts were "acquired from other persons or sources." *In re Sealed Case*, 737 F.2d at 99 (internal quotation marks omitted).  This latter rule is not absolute, however, because any attorney's "advice prompted by the client's disclosures may be further and inseparably informed by other knowledge and encounters." *Id.*  Therefore, courts have held that "the privilege cloaks a communication from attorney to client based, in part at least, upon a confidential communication to the lawyer from the client." *Id.* (cleaned up).

briefs, and, accordingly, the Court will deny Hall's motion with respect to these 40 documents and grant the EPA's cross-motion for summary judgment.

Hall also lodges a handful of document-specific objections to the EPA's *Vaughn* index. It first argues that three records responsive to the Enforcement Orders were improperly withheld pursuant to Exemption 5 because they were developed *after* the PVSC administrative order and, thus, are necessarily post-decisional. Dkt. 42 at 45 (discussing Documents 3769, 3772, and 13196). The EPA offers two responses: First, it observes that the records at issue are email chains, and even though "the most recent email listed on the index is dated the same day or day after the signing of the order does not mean that every email in the chain postdates the order," and, as a result, "there is no reason to doubt EPA's representation in each entry that the withheld information predates the final order." Dkt. 47 at 26. Second, the EPA contends that some of the withheld records "predate other, related decision[s]." *Id.* In particular, Document 3772, the EPA says, involved predecisional deliberations about the content of a briefing for senior managers related to the administrative order, not the content of the order itself, *see* Dkt. 40-1 at 231 (Pollins *Vaughn* index), and Document 13196 is a predecisional summary of the recently finalized order, *see id.* at 618 (Pollins *Vaughn* index).

Hall raises some reason to doubt the predecisional and deliberative nature of each of these documents, and the EPA's rebuttals are not sufficient to justify granting summary judgment in its favor. As an initial matter, the Court is unable to tell from the agency's *Vaughn* index what portion of the email chains that have been withheld occurred before the date of the PVSC administrative order or after it. With respect to Document 3769, the *Vaughn* index entry indicates that there are three emails in the chain and states that the withheld material "discuss[ed] proposed changes to a draft Administrative Order on Consent." *Id.* at 229 (Pollins *Vaughn*

index).  It would be impossible for the agency to propose changes to the administrative order the day *after* it was signed, however, and the *Vaughn* index entry indicates that at least one of the three emails is dated April 17, 2018, the day after the PVSC administrative order was signed. Neither the EPA's reply brief nor its *Vaughn* index provides any alternative reason why content dated April 17, 2018, should be withheld.  Thus, the Court will grant Hall's motion for summary judgment in part with respect to this document and order the EPA to release any portion of the record dated *after* the signing of the PVSC administrative order on consent.

With respect to the remaining two documents, the Court observes that deliberations regarding the content of an internal briefing about a final agency decision and draft summaries of a finalized orders present close calls with respect to the application of the deliberative-process privilege.  *See Protect Democracy Project*, 569 F. Supp. 3d at 41–42.  Given the nature of these documents and the fact that they post-date the PVSC Administrative Order, there is a high likelihood that the content contains reasonably segregable factual information or that the release of these documents would not result in foreseeable harm to internal agency deliberative processes.  Out of an abundance of caution, therefore, the Court will order the EPA to submit ED_001856_00003772 and ED_001856_00013196 to the Court for *ex parte*, *in camera* review.

The Court will grant summary judgment to the EPA, however, with respect to the remaining two documents that Hall challenges: Documents 9600 and 12943.  Hall insists that Document 9600 must contain segregable information because it is a 56-page document that was withheld in full.  Dkt. 42 at 45.  However, as the EPA persuasively explains, that document is "a weekly report of issues across the EPA with recommended next steps and options being contemplated for future monitoring . . . or upcoming investigations."  Dkt. 47 at 26; Dkt. 40-1 at 377–78 (Pollins *Vaughn* index).  Understood in this light, that document is quintessentially

deliberative and properly withheld.  With respect to Document 12943, which is entitled "PVSC Bypass Fact Sheet," Hall suggests that the document "must contain factual information that should have been released earlier."  Dkt. 42 at 46.  Upon review of the EPA's *Vaughn* index entry, the Court concludes otherwise.  The EPA withheld this document pursuant to the deliberative-process, attorney-client, and attorney work-product privileges.  *See* Dkt. 40-1 at 530–31 (Pollins *Vaughn* index).  The *Vaughn* index explains that this document "is deliberative because it is composed of recommendations as to how issues should be addressed in the then-developing Administrative Order on Consent, and it includes draft proposed language under consideration for the consent order."  *Id.* at 530.  Specifically, the fact sheet focuses on developing "an appropriate provision concerning wet weather bypassing" in the order.  *Id.*  In addition, the "document is a draft that was still being developed" and was "sent to others at EPA for their input and feedback."  *Id.*  The *Vaughn* index also asserts that the document "includes the client's analysis of case issues, strategic considerations, opinions, and comments."  *Id.*  Based on this description, the Court concludes that the document was properly withheld by the EPA.  To the extent that any purely factual information has been withheld, the *Vaughn* index suggests that it is either inextricably intertwined with the author's deliberative content or represents the author's distillation of a larger universe of facts such that release of the information would provide insights into the agency's deliberative process.  *See Protect Democracy Project*, 569 F. Supp. 3d at 39; *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 513 (D.C. Cir. 2011).  Hall also argues that the Court should review this document *in camera*, because doing so will enable the Court to "determine if EPA was deliberating some new policy position regarding blending . . . or whether the Agency was simply applying the existing regulatory position."  Dkt. 42 at 46.  Informational purposes, however, are not a valid basis for ordering *in*

*camera* review where the agency's justifications for exempting information from disclosure are otherwise adequate. *See Larson v. Dep't of State*, 565 F.3d 857, 870 (D.C. Cir. 2009) ("If the agency's affidavits provide specific information sufficient to place the documents within the exemption category, if this information is not contradicted in the record, and if there is no evidence in the record of agency bad faith, then summary judgment is appropriate without *in camera* review of the documents." (internal quotation marks omitted)).  As explained above, the EPA's justifications for withholding Document 12943 are more than sufficient.

None of Hall's remaining arguments with respect to the EPA's response to the Enforcement Order Request has merit.  For instance, Hall argues that the EPA's *Vaughn* index is "insufficient to justify continued document withholding" because it "contains extensive, repeated conclusory language to explain why the various privileges of Exemption 5 apply to each record." Dkt. 42 at 39–40.  The Court disagrees.  Between the Kloss declaration and the Pollins declaration, the EPA has submitted 766 pages of single-spaced *Vaughn* indices in this matter, with many individual entries occupying multiple pages.  Although the Court has concluded that for certain documents, *in camera* inspection would provide further clarity regarding the nature of the withheld information, the Court concludes that the agency's descriptions are otherwise sufficient to support its Exemption 5 withholdings.  Accordingly, the Court declines to order the EPA to further supplement its draft declarations or *Vaughn* indices at this time.

Hall similarly claims that the EPA's foreseeable harm language is "boilerplate" and "the type of language that the D.C. Circuit has previously rejected as inadequate."  Dkt. 42 at 47; *see also* Dkt. 36-1 at 44–45.  The Court once again disagrees.  On the Court's review, the agency's *Vaughn* indices appropriately specify a particular harm that would result from disclosure and link that harm to the specific type of information contained in the withheld material.  That amount of

justification suffices. *See Machado Amadis*, 971 F.3d at 371. To be sure, many *Vaughn* index entries contain the same language, but that is because many of the withheld documents are similar—which explains why the parties have been able to group them into a small number of categories. Above all else, however, Hall only makes a generalized attack on the agency's *Vaughn* index and does not point to any specific entries that it finds problematic. In the absence of a more directed criticism, the Court declines to order the EPA to supplement its foreseeable harm language.

Finally, Hall argues that the EPA "has been mischaracterizing the responsive records in an attempt to withhold them" and therefore "should lose all deference usually afforded to an agency in FOIA matters." Dkt. 42 at 41, 44. As proof, Hall points to the EPA's release of 16 additional records in whole or in part that the agency had previously withheld under Exemption 5 but later decided to disclose after Hall's motion for summary judgment. According to Hall, the content of these records does not match their original descriptions in the *Vaughn* index, demonstrating (in Hall's view) that the EPA "mischaracterized the content of the records in their own self-interest." *Id.* at 44. As a result, Hall asks the Court to review all the contested records *in camera*. The Court is unpersuaded. Far from demonstrating bad faith, the EPA's re-review of the withheld records and decision to engage in a supplemental disclosure, on its own initiative and unprompted by the Court, "evidences a good-faith" effort on the EPA's part to ensure that only material protected under Exemption 5 is withheld from Hall. *See Schoenman v. FBI*, 575 F. Supp. 2d 136, 161 (D.D.C. 2008).

Accordingly, the Court will grant in part and deny in part Hall's motion for summary judgment with respect to part three of the Enforcement Order Request and will grant in part and deny in part the EPA's cross-motion for summary judgment.

**CONCLUSION**

For the foregoing reasons, it is hereby **ORDERED** that Plaintiff's motion for summary judgment, Dkt. 36, is **GRANTED** in part and **DENIED** in part, and that Defendant's cross-motion for summary judgment, Dkt. 38, is **GRANTED** in part and **DENIED** in part.  It is further **ORDERED** that Plaintiff's motion for leave to file a surreply, Dkt. 48, is **DENIED**.  It is further **ORDERED** that Defendant shall release any portion of Document ED_001856_ 00003769 that is dated after the signing of the PVSC Administrative Order on Consent.  And it is further **ORDERED** that, on or before October 11, 2022, Defendant shall submit unredacted copies of the following documents to the Court for *ex parte*, *in camera* review: Documents 1, 2, 3, 4, 5, 6, 7, 14, ED_002113B_00000054, ED_002113B_00000055, ED_002113B_00000056, ED_001856_00000105, ED_001856_00000166, ED_001856_00003488, ED_001856_00003800, ED_001856_00012741, ED_001856_00012953, ED_001856_00012958, ED_001856_00003772, and ED_001856_00013196.

**SO ORDERED**.


/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date:  September 27, 2022